Samuel C. Coleman, J.
Four actions have been tried together. Three of them are actions at law by one plaintiff or another to recover upon three notes, respectively, of which the respective plaintiff claims to be the payee in one capacity or another. The fourth is by one of the defendants in which it asks to have two other notes declared invalid. As to the three notes involved in the law actions, the defendants deny any liability — on the ground that there is no validity to the notes as negotiable instruments. All five notes are dated April 1, 1957 — a day before the sudden death of one Herbert Purdy, one of the two individuals concerned with four of the five notes — again, in one capacity or another.
For almost 30 years, two brothers, Herbert and Frederick Purdy (Frederick is one of the defendants) had been closely associated in the real estate business, in the ownership, operation *344 and management of large buildings. At the time of Herbert’s death the interest in the business of each of the two was about equal. Madison Central Corporation owned a large office building at 299 Madison Avenue; all of its stock was owned by Herbert. Sixty-six Court Street, Brooklyn, was owned by Frederick under a corporate name. Fifth Madison Corporation owned 342 Madison Avenue—the Canadian Pacific Building— the stock in which was owned by the two brothers equally, either in their individual names in corporate form, or through the Purdy Management Corporation. The Purdy Management Corporation managed and operated the buildings and some others. Each of the two brothers had a half interest in the management corporation. They were officers and directors in all of the corporations concerned. Their affairs were conducted from a single office where each one had access to the other’s desk, where all papers and documents were available to them and to trusted employees.
Herbert was survived by his wife and a daughter, who are his executors and who sue in that capacity to recover on two of the notes. The widow sues individually on one note. The total amount of these three notes is $1,285,000; the total of the other two, the subject of the action for declaratory judgment, is over $330,000.
The day after Herbert’s death, Frederick had Herbert’s widow and daughter elected as officers and directors in the place of Herbert. They were also voted salaries equalling the salary that Herbert had been receiving in his lifetime. But dissention broke out — smoldering for a time, apparently. In August, 1958, Frederick was instrumental in having mother and daughter removed from their respective positions as officers and from the directorates and others substituted for them. They brought suits to have their removal declared illegal and for unpaid salaries. Those actions are still pending; so far as they relate to the illegality of the removal, at least that question has been decided against mother and daughter and is now on appeal. (See 9 A D 2d 661 ; 10 A D 2d 676 ; 10 A D 2d 841, 842 ; 11 A D 2d 682.) The mother brought a civil action against Frederick for assault in January, 1959; that action is pending. Charges of criminal assault which each lodged against the other resulted in respective acquittals (April, 1959).
In other litigation in this court Fifth Madison Corporation in January, 1958, brought suit against mother and daughter as executors, first, to set aside certain deeds executed by Herbert and, second, to recover over $233,000, which Herbert had bor *345 rowed from Fifth Madison and which had not been repaid by him or by his estate. Judgment against the defendants, mother and daughter in their capacity as executors, was entered September 22, 1959, setting aside the deeds to the real property and decreeing judgment against the defendants for over $268,-000. [See 26 Misc 2d 656.] Although one of the notes in suit here is a note in favor of Herbert from Fifth Madison for $400,000, the defendants in this litigation made no mention of it, and did not set it up as a setoff or as a counterclaim.
And on January 9,1960, the attorneys for the executors wrote the attorneys for the defendants that Mrs. Purdy, the widow, in the course of going through certain papers of her husband, on Christmas Day, 1959, had come upon the five notes involved in this litigation, notes totaling $1,628,592.41.
The defendants denied liability and the plaintiffs brought the three actions I referred to (on notes totaling $1,285,000), and a fourth one, the latter being an action to recover an alleged indebtedness equal to the amount of the two other notes, $343,-592.41, not on the notes themselves. That action is not before me. The declaratory judgment suit, however, asks that these two notes be adjudged void.
As the plaintiffs say in their brief, ‘ ‘ the plaintiffs ’ case consisted exclusively of the presentation in evidence of the three promissory notes in suit * * * after it had been established (1) that said promissory notes were discovered among the effects of the decedent Herbert McLean Purdy, * * * as evidence of their delivery by the respective makers * * * and (2) the identification and authenticity of the signature of the several makers * * *. Plaintiffs then rested.”
The signatures on all five instruments were, of course, genuine ; but there is absolutely no proof that the notes—not only the three but all five—were “ discovered among the effects of the decedent ”. There is no basis for invoking a presumption of delivery as to any one of them, none for concluding as a fact that there was delivery (Negotiable Instruments Law, § 35).
The proof offered by the widow was substantially this: In the course of her examination of some papers she came upon a large envelope which contained two yachting flags (Herbert was a devoted yachtsman), an unfolded letter dated April 1, 1957 signed by Herbert, addressed to a flag manufacturer and referring to yachting flags; and the five notes in question, with other cancelled notes. Letter and flags were in a large envelope from the flag manufacturer, postmarked April 1,1957. She had never seen the notes before and the envelope itself was in a private file *346 in the husband’s office with other boating papers or had been on her husband’s yacht itself; she was not sure.
The clear import of this testimony was this: On April 1,1957, the two brothers sat down and settled certain accounts between them, drew up and signed notes. (In a belated brief received from the plaintiffs only the other day, they acknowledge ‘1 the necessary assumption that protracted discussions between Fred and Herbert Purdy preceded the transaction on April 1,1957.”) The notes were delivered to Herbert, as an individual, not as an officer of any corporation, and were placed by him in a large envelope with personal papers in no way related to the real estate business. They had not been discovered before Christmas Day, 1959.
But this testimony was utterly destroyed by the fact that the envelope was postmarked April 11, not April 1. The insistence by Mrs. Purdy that it was April 1 and her shakiness of manner when it became clear to her that her position as to the date was untenable, indicate her awareness of the significance of the date. The letter of April 1 which she would have had me believe from the fact that it was unfolded, had not been mailed, had in fact been mailed to the addressee, and returned by it with the two flags which Herbert had sent with the letter — all in the envelope postmarked April 11.
Moreover, Mrs. Purdy had been through this very letter folder or envelope only a few months after her husband’s death, had seen the flags in them and had noted the contents of the envelope on the envelope itself—flags and letter.
Herbert, therefore, did not, could not place the notes in the envelope on April 1,1957.
With this pretense of delivery shattered, additional, really substituted testimony was offered on an adjourned date. A friend of the daughter, one Whittemore, testified that in August or September, 1958, he and the daughter discovered Herbert’s notes with other cancelled corporate notes. As to this testimony, the plaintiffs say: ‘ ‘ Suffice to state briefly that its purpose and legal effect was to establish that the five promissory notes =;:= * * were found among the effects of the decedent * * * in one of the drawers of his personal desk in his erstwhile office in Room 2100 in the Canadian Pacific Building * * * and that they found their way into the Annin & Co. envelope * * * when they were placed in the latter by either Mr. Whittemore or Miss Joan Purdy, for the purpose, and on the occasion, of the removal of said desk, its contents and of all other personal effects of the decedent from said office in the *347 Canadian Pacific Building to the place of business of the executors of his estate at 299 Madison Avenue the latter part of August or the first week of September 1958 * * *.” (“ Personal desk ”, I add here, means Herbert’s business desk in the office.)
This testimony, too, I reject out of hand. Whittemore’s demeanor was equivocal, his answers hesitant and uncertain, and they hardly sufficed even to justify taking his statement that these were the notes. There was an aura of unreality about his testimony and its presentation after the collapse of Mrs. Purdy’s testimony as to the time and manner of the finding of the notes. Of course, it was intended to rehabilitate Mrs. Purdy’s testimony and to save the factor of “possession”. But it was so contrary to what she had asked me to believe, insisted upon my believing, that she cannot complain if I view Whittemore’s testimony with complete disbelief. For now delivery is to be presumed not from the fact that the notes were found in a personal envelope, in a personal file, to be likened, say, to a filing cabinet in Herbert’s home, where Herbert might have placed them the day before his death, but in his business desk, in his office, from which they had never been removed, or withdrawn, and now it was the daughter or Whittemore who placed them in the large envelope—not Herbert himself.
According to Whittemore, the daughter was with him and both he and the daughter handled the notes, and commented on what they had found. One or the other, according to him, put the notes in the envelope. But daughter testified only that she was in charge of the removal of the papers. She identified the signatures of her father and of her miele. She said nothing about finding the notes with Whittemore. And mother said that the daughter did not report finding the notes to her. Moreover, mother testified on an adjourned date that daughter was with her when she found the notes on Christmas Day, 1959. I repeat here that neither mother nor daughter, executors, availed themselves of one note of $400,000 from Fifth Madison to Herbert Purdy which could have been used to wipe out the claim made by Fifth Madison against Herbert’s estate in the litigation I have referred to.
With the testimony of 1‘ possession ’ ’ completely cancelled, reduced to zero by its own factor, we know only from the plaintiffs ’ case that there were five notes, but we know nothing about the circumstances in which they were prepared, where they were found and when or by whom delivered to whom. We know nothing about possession. We do not know whether the respective *348 makers ever delivered the notes to anyone ‘‘ for the purpose of giving effect thereto ”, and in the absence of delivery a negotiable instrument is of no force whatsoever (Negotiable Instruments Law, § 35).
But we do know that from the date of Herbert’s death until his widow and daughter were relieved of their duties as corporate officers, in August, 1958, each of the two had full and ready access to all of the books, records, documents in the real estate office, including, of course, the contents of Herbert’s desk, and of Frederick’s desk, as well, to which she had a key. And we do know that more than once the widow had gone through her husband’s desk searching for bankbooks, bank accounts, etc.
With this I turn to the separate notes, departing from the plaintiffs ’ testimony on delivery to consider other factors where they appear from plainly competent testimony.
1 and 2. The notes involved in the action for declaratory judgment. Each of them is dated April 1, 1957 — the maker in each is the Purdy Management Corporation; the payee in each is the Madison Central Corporation, all the stock of which, I have said, is owned by Herbert; each bears the signature of the two brothers under the corporate name; each surprisingly enough contains the indorsements of the two brothers. One is for $193,592.41; the other for $150,000.
As to these corporations the situation is as follows: For years there was a running account between the two. It contained many items of debits and credits, rents collected from the tenants of the large office buildings owned by one or the other of the brothers or in which they had an interest, payments made, taxes paid, reconciliation with bank statements, etc. Accounts were drawn up for each month by an accountant generally after the middle of the following month. The amount shown to be due Madison Central was not paid but was carried on the books from month to month as a credit to Madison Central. The account for the month of March, 1957, drawn up late in April by the corporation’s accountant, a copy of which he later gave to Mrs. Purdy, did show an indebtedness of Purdy Management to Madison Central of $193,592.41. That indebtedness as of that date has not been denied. By June 30, 1957, for instance, the indebtedness amounted to about $188,000. And in August, 1958, when mother and daughter were removed from office, the indebtedness amounted to a little over $188,000. This indebtedness by Purdy Management is admitted. No note had ever before been given for any monthly balance and although it may have been physically possible for the two *349 brothers to have sat down on Sunday, March 31., or Monday, April 1, and computed the exact amount due, I do not believe that they did.
Frederick testified they did not compute the indebtedness; that he did not sign the note in the completed form as presented to me, and I accept his testimony. No question of incompetency on his part to testify arises here; whether the testimony is taken as part of the plaintiffs’ actions or in connection with the suit to declare the note void, the transaction involved is between corporations only—the transaction being only the making and delivery of the note. No personal transaction is involved. Moreover, it is significant that Madison Central (in the separate action not before me) is not suing on this note but on an indebtedness equal to its amount.
The note for $150,000 is no more valid than the other. Here again Madison Central in the separate action is suing for an indebtedness in this amount, not on the note itself. Again, Frederick denies that he signed the note in this form or that Purdy Management owed this amount, and I accept that testimony too.
Differently from the valid indebtedness of $193,592.41 as of April 1, 1957, there is no additional indebtedness of $150,000. That amount is included in the larger amount of $193,592.41 and the inclusion came about in this wise:
In 1953 the two brothers, who had given notes to Madison Central, totaling $150,000, arranged to have their accounts adjusted in this respect and to have the indebtedness assumed by Purdy Management. Indeed the suit for $150,000 (not before me) by Madison Central against Purdy Management relies on this very arrangement between the two brothers as the basis for the indebtedness. In November of 1953 the indebtedness from Purdy to Madison Central, as shown on the monthly accounts, such as I have described above, was $52,051.77. To this amount, in the account for the following-month the indebtedness of $150,000 assumed by Purdy Management by this arrangement, was added and thereafter was included in each monthly statement from December, 1953, to April, 1957. It resulted in the larger figure of $193,592.41 for March, 1957.
There is not the slightest doubt in my mind that the claim for $150,000 is part of the claim for the larger sum. When the briefs for the executors were submitted their attorneys asked permission to remove the accountants’ records from the court so that the latter could examine more closely the matter of *350 “ duplication ”, that is, of the inclusion of the $150,000 in the larger amount. They received the records and returned them to me a week or two ago, without comment. After my opinion had been drafted the additional brief referred to was received. It contains nothing to bring about a change in my views.
3. Note for $135,000. The payee is Mrs. Purdy individually; both brothers signed as makers and as indorsers. The action is only against Frederick. The note is void. As Mrs. Purdy is payee, let us put aside her testimony and that of Whittemore as to the circumstances in which the note came into her hand and consider the case as a conventional one between maker and payee. As Frederick testified (again I accept his testimony), he did not sign this note in this form, did not authorize it to be filled out or to be delivered; and at no time was there any indebtedness from him to his brother’s wife. Mrs. Purdy did not contradict Frederick’s testimony as to the absence of any indebtedness; and it was a preposterous suggestion to be made in her behalf that her acting as a hostess at a “ party ” on her husband’s yacht to Frederick’s business associates was consideration for a note for $135,000. The suggestion is a measure of the integrity of the testimony offered by the plaintiffs.
4. Demand note to Herbert from Fifth Madison for $400,000, signed by the two brothers as officers of Fifth Madison, and indorsed by each one. Here the plaintiffs have failed to prove their case. Aware of the principle that ‘1 every contract on a negotiable instrument is incomplete and revocable until delivery of the instrument for the purpose of giving effect thereto ” (Negotiable Instruments Law, § 35) and of the rule that they must prove delivery, they rely on the last sentence of section 35 to support their position. “ And where the instrument is no longer in the possession of a party whose signature appears thereon, a valid and intentional delivery by him is presumed until the contrary is proved.”
Of course, testimony that the note was in the possession of Herbert as an individual might be sufficient to show that it had left Frederick’s possession, but testimony merely that it is now physically in the possession of Herbert’s executors does not satisfy me that it had been in Herbert’s possession, particularly where mother and daughter had access immediately after Herbert’s death to every paper in the business office of the two brothers.
The case stands empty of any testimony that the note at any time was in Herbert’s possession as the payee. I reject the testimony of Mrs. Purdy that the note was found in a large *351 envelope, by inference placed there by Herbert together with the flags. I reject the testimony that it was found by Whittemore and daughter in Herbert’s desk in August or September, 1958, when the action brought against the executors by Fifth Madison was already pending.
We are therefore completely in the dark as to the note. We do not know where it had been and by whom placed there. There certainly is no basis for saying that it had left Frederick’s possession. And even if the testimony as to the finding of the notes by Whittemore and daughter could be accepted, as Herbert was one of the two signers of the note—he and his brother as corporate officers — and as the note had been found in his business desk, there is no basis for saying that it was not in his possession as ‘1 maker ’ ’, i.e., the effective hand of a corporate maker, or the converse. If it was in Herbert’s possession as a necessary signator, it had not left the corporation’s possession or been delivered to anyone. In any case, it was not in Herbert’s possession as payee. The correlative that it was out of the possession of Frederick or of the corporation does not appear and the presumption of delivery does not come into operation. There was no delivery and there can be no recovery upon this note.
Moreover, the note is from the corporation to one of its officers who is one of the signatories for the corporation and there is nothing in the corporate books to show that such a note was issued or that there was any indebtedness at all to him. Indeed, the opposite was the fact and has already been so determined by judgment.
5. Note by Frederick to Herbert for $750,000. What I have said under heading 4 applies here, except, of course, that the problem of the identity of a signer of a corporate note and the payee as bearing upon possession in or out of the hands of a corporate maker does not exist. Here, again, before the presumption of delivery can operate the testimony must show that the note left Frederick’s possession, or, cor relatively, that it was in Herbert’s possession. There was no such testimony. The testimony upon which I was asked to draw the inference that it had left Frederick’s possession or that it was in Herbert’s possession was false.
If we consider the plaintiffs’ efforts to show that there was consideration for the note, they utterly failed to do so.
Without reference to any testimony by Frederick there was an attempt to show that an exchange of property between the two brothers in 1953, resulted in an “imbalance” of *352 $750,000 in Frederick’s favor, but the documents do not show this to be the case, and if there was an “ imbalance ” to be corrected, Herbert was entitled only to one half of the $750,000, not all of it. The cause of action upon this note must be dismissed.
There are other circumstances which lead to the conclusion that there was no delivery. If I am right in my analysis it is perhaps unnecessary to go into them, but consideration of those circumstances, I think, is warranted for a full disposition of the matter.
There was testimony from a former employee of the brothers, testimony that I accept in substance, that the brothers from time to time had signed notes in advance to be used when necessary in the absence of one or the other, for one corporate purpose or another. The plaintiffs in their brief acknowledge that this “would seem [to have been the case] on two and possibly three isolated and totally unrelated occasions ”.
The form of the notes, the indorsements, oppose the plaintiffs’ position. As to the two notes (1 and 2) —Purdy Management to Madison Central—I have already concluded that the two brothers did not on April 1, 1957, compute the amount of indebtedness and that the note for $150,000 represented part of the larger indebtedness. But Herbert owned 100% of the stock of the Madison Central. Why then should he have indorsed the note above his brother’s signature as indorser? Was he transferring it back to Frederick? Or were the two brothers personally guaranteeing the indebtedness of the corporation in which each was one-half owner to another corporation whose stock was entirely in Herbert’s hands? The note was on a printed form wherein the Industrial Bank of Commerce was named as payee. That was the only bank in which Purdy Management had its account. Singularly, “ Madison Central ” was typed in as payee between the printed lines, and the words “ to be deposited in ” were also typed in, preceding the printed name of the bank.
The note for $150,000 was on a blank form, but this, too, bore the indorsement of the two brothers, and what I have said about the strangeness of the indorsement in the preceding paragraph applies here.
As to the note for $135,000 to Mrs. Purdy, it is significant that both brothers signed as makers and both as indorsers. The plaintiffs have glossed over the fact that Herbert was a comaker and have completely ignored the fact that both brothers indorsed *353 the notes. If the note was valid, what did the indorsements add to it?
As to the $400,000 note, Fifth Madison to Herbert, both brothers signed as officers and both again as indorsers. Was Herbert as an individual guaranteeing payment to himself?
And as to the $750,000 note, although it was signed only by Frederick as maker, it was indorsed twice by each of the two brothers. Plaintiffs rely on the fact that Frederick alone signed as maker as indicating that no corporate signature was intended. But, again, what did Frederick’s indorsement add to his obligation? And why was Herbert twice guaranteeing an obligation to himself?
I have referred to Frederick’s testimony only with respect to the three notes as to which his competency to testify cannot be questioned—the two notes from corporation to corporation and the note to Mrs. Purdy personally.
As to these, his testimony, quite apart from the plaintiffs’ failure to prove delivery, established that no one of the three notes had any validity. The cases were tried together under a stipulation that the testimony in one could be used in the others, but I did not think the plaintiffs should have been held strictly to the stipulation so far as ‘ ‘ personal transactions ’ ’ are concerned. I have, therefore, not considered Frederick’s testimony as it related to any matters that could determine the validity of the two other notes, questions of delivery, or consideration, for instance.
An argument can be made for accepting his testimony on these matters based on the plaintiffs’ insistence that all five notes were delivered to Herbert and placed by him in the large envelope on April 1 as a single episode. May not Frederick’s testimony as to three of the notes be taken as a basis for saying that the other two notes were not delivered to Herbert as an individual?
A strong argument can be made for the defendants that by the plaintiffs’ testimony—to the effect that Frederick gave all five to Herbert individually, or as an officer of the payee — the plaintiffs have “opened the door ” to Frederick’s testimony, at least to the extent of enabling him to say that he did not sign the notes in the form in which they now appear, that he did not authorize them to be filled in, or deliver them, or authorize them to be delivered. His testimony as to the practice of signing notes in advance, it could be urged, would be admissible with the “ door open or closed ”. But, as I have *354 said, I have not considered any portions of his testimony to which the plaintiffs objected, except as the testimony related to the three notes; and I do not think the testimony objected to is necessary to a decision.
But the case may go up and the weight of Frederick’s testimony may be taken into consideration.
For that purpose I state that I accept Frederick’s testimony in substance that there was no delivery of the notes, that there had been a practice for years between him and his brother to sign and indorse notes in advance and in blank and that he did not sign these notes in the form in which they appear, did not deliver them to anyone or authorize their delivery.
I add a few words on the testimony of handwriting and typing experts. There were three — two of them for the plaintiffs. In one respect testimony of all three was inconclusive — on the sequence of signature and filling in of the body of the note. Their testimony as to sequence related mainly to the order in which the brothers placed their signatures and also as to whether a typing of a corporate name preceded the handwritten signatures, plaintiffs’ witnesses saying the typed name came first in one or two instances. But the testimony is clear that more than one pen was used for the actual signing. One of the plaintiffs’ experts testified that on the note for $150,000, date and corporate name were typed in at one time, and the body filled in at another—he could not give the order — all being typed on an L. 0. Smith machine. Both sides agreed as to the $400,000 note that the typing of the body was on an L. C. Smith, and the corporate name and titles of the officers on a Boyal. There were two separate typings, but no witness could give the order of the typings. One witness for the plaintiffs, who had ‘ ‘ no idea ’ ’ which came first, could not say whether the date was typed in when the body was filled in or when the name of the corporate maker was typed. As to these two, the testimony of Frederick is nn contra dieted that there had never been an L. 0. Smith machine in the business office of the two brothers; there was one in a small office in the building owned by Herbert. It is unlikely that this machine would have been used on two different occasions for the $150,000 note, and the question arises why the body of the $400,000 note was typed on an L. 0. Smith when the name of the maker was typed on a Boyal used in the real estate management office. Moreover, the testimony of the witness for the defendants satisfied me that the indorsement of Herbert was placed on this note before the body was filled in. On the whole, the testimony of all three witnesses is more *355 favorable to the defendants than to the plaintiffs; but the defendants’ case does not really need the support of experts.
This brings me to the suit for declaratory judgment. The putative maker of the two notes to Madison Central asks me to have the notes declared void and delivered upon the ground that the notes might be negotiated and that they might face a suit upon them.
I have already stated my views as to these notes and my conclusion as to their invalidity. I did so because they bore on the credibility of Mrs. Purdy and of Whittemore. But as Madison Central is not suing upon these notes and as the notes could hardly now be negotiated, a subsequent holder, assuming they were negotiated, would find himself in no better position than Madison Central (Negotiable Instruments Law, § 90). Purdy Management runs no risk of being subjected to suit upon these notes. If I were to declare the notes void, my action might prejudice the suit now pending for the indebtedness of $193,000, an indebtedness which did in fact exist at one time, although later reduced, as I have said, to $188,000. And so with the note for $150,000, which is closely related to the larger one.
I think, therefore, it would be better not to grant the prayer for declaratory judgment; if what I have said with respect to these two notes should stand in the way of Madison Central’s offering testimony in its action on an alleged indebtedness, that is a matter which cannot be avoided.
When this opinion was being typed in final form, the attorneys for Mrs. Purdy and her daughter, by letter, asked for oral argument on some aspects of the case. I had indulged the attorneys — for the separate litigants ■—in the matter of the time for filing briefs, to give them an opportunity to adjust some of their disputes and also because they were engaged in preparing briefs on appeal and arguing those appeals in their manifold differences (as well as in preparing briefs at Special Term). I see no occasion now for oral argument.
Each of the three actions at law before me is dismissed, with costs. The action for declaratory judgment is dismissed, without costs.